## No. 21160.

### GUADALUPE ARCHULETA *v.* SABINO ARCHULETA.
(413 P.2d 704)

Decided May 2, 1966.

Preston & Altman, for plaintiff in error.

Ernest U. Sandoval, Albert J. Tomsic, for defendant in error.

*In Department.*

Opinion by Mr. Justice McWilliams.

This writ of error presents a dispute between two brothers, Guadalupe Archuleta (hereinafter referred to as Lupe) and Sabino Archuleta (hereinafter referred to as Sabino), relating to the propriety of Sabino's various actions concerning certain land owned by their father at the time of his death.

J. G. Archuleta, father of Lupe and Sabino, died intestate in 1933, with his wife and nine children surviving. As of the date of his death J. G. Archuleta owned, among other things, approximately 2755 acres of land situate in Huerfano County. Sabino, who was the oldest of the nine children, was duly appointed administrator of his father's estate on November 28, 1933, and even as of the present time he is still continuing to serve as such administrator. In other words, as yet there has been no final settlement of the estate, as provided for by C.R.S. 1963, 153-14-11. And not only has the estate not yet been closed, but also there has never been filed any six months report, as provided for by C.R.S. 1963, 153-14-1, nor has there ever been any order dispensing with the filing of such reports.

By way of background information, it should be noted that the Colorado Inheritance Tax Department report filed on March 12, 1934, disclosed assets in the Archuleta estate of $14,750 and various claims and deductions amounting to $16,622.50. However, the actions of Sabino about which Lupe now makes complaint occurred some twenty years later. More specifically, on May 13, 1954, Sabino, as the administrator of his father's estate, under order of court conveyed certain realty in the estate to one Vigil, purportedly for the sum of $8,000, though neither this sum nor any money whatsover was ever actually received by Sabino from Vigil. Very shortly thereafter Vigil conveyed this land to Sabino in Sabino's individual capacity, again with no money changing hands.

Another portion of the land in the Archuleta estate was sold by the county treasurer for nonpayment of taxes, and in due time a tax deed therefor was issued to one Saliba. Thereafter, Saliba in 1955 then conveyed this particular tract of land to Sabino, again in his individual capacity.

Sabino next brought a quiet title action, and by a decree, dated December 21, 1956, he quieted title to

both of the aforementioned tracts of land in his own name. In that quiet title proceeding Lupe, though served, made no appearance nor did he in any manner contest Sabino's request that title to the realty be quieted in him as an individual.

In 1957 Sabino sold a portion of this land in and to which he had just quieted title to one Hurlburt for $30,000. Another tract was sold in 1962 to one Gomez for $10,800. Later on in 1962 Sabino also contracted to sell the balance of this land, some 180 acres, as follows: 60 acres to the aforementioned Gomez for $8,200 and 120 acres to Gus White for $20,000. On the contract to sell the 60 acres to Gomez, Sabino received the sum of $500; and on the contract to sell to White, Sabino received the sum of $2,000. In 1944 Lupe had purchased a residence (but not the land on which it was located), situated on the particular tract of land which was the subject of the contract of sale to White, and it was the very distinct threat of eviction from his home which no doubt triggered this controversy between Lupe and his older brother, Sabino.

Thus, it was in this setting that Lupe in 1963 instituted the present action against Sabino. The gravamen of the complaint was that under the circumstances which have been set forth above, Sabino should be compelled to account to the estate for all monies received by him from the sale of the aforementioned realty, as well as all monies received or to be received on the aforementioned contracts to sell. Initially, in his complaint Lupe also sought an injunctive order restraining Sabino from selling any of these lands which he had not as of that time already sold. Upon trial, however, it developed that all of this land in and to which Sabino had quieted title had either already been sold, or was under a contract of sale. None of the purchasers were joined in this proceeding, and hence their rights could, of course, not be adjudicated in the instant action.

By his answer Sabino averred that any and all money

received by him, either as administrator of his father's estate or in his personal capacity, "had been used to preserve the estate of J. G. Archuleta, to the extent possible." Sabino also alleged that Lupe was "estopped to demand any accounting from defendant by reason of having failed to enter an appearance in said quiet title action . . . ." Finally, however, Sabino alleged that "notwithstanding all of the foregoing," he was prepared to pay into the court the fractional interest that Lupe might have as an heir of J. G. Archuleta.

A trial was had to the court which resulted in a total victory for Sabino. It was held that after the quiet title action Lupe not only had no interest in the land in and to which title had been quieted in Sabino, but also that under the circumstances he had no interest in the proceeds from the ensuing sales of such lands. In other words, it was held that Sabino need make no accounting. Finally, though this particular matter was not in any manner raised by the parties themselves, the trial court nonetheless ordered that Lupe remove his residence from the tract of land then under contract of sale to Gus White within 60 days and, upon his failure to thus remove this residence, such would thereafter "become a part of the real estate upon which it is situated." By writ of error Lupe now seeks a reversal of this judgment.

■ Considering first that part of the judgment directing Lupe to remove his residence from the tract of land under contract of sale to Gus White, we hold that this determination was improper in that such was clearly outside the issues raised by the pleadings. Nor was this issue tried with any consent of the parties. Indeed, to the contrary all counsel agreed that this particular matter was *not* properly before the court. Under these circumstances this part of the judgment cannot be sustained.

■ Continuing, then, our perusal of the record convinces us that the trial court did err in its determina-

tion that Sabino need make no accounting to the estate of the monies received by him from the sales of the aforementioned parcels of land. And such is true even though title to these lands had theretofore been quieted in Sabino. In reaching this conclusion we are merely giving effect to Sabino's own concept as to his role in these various transactions, as such is indicated by his own testimony as given upon trial.

Initially, it should be remembered that in his answer Sabino affirmatively alleged that any and all money received by him, either as the administrator of his father's estate or in his personal capacity, "has been used to preserve the assets of the estate . . . . to the extent possible." In thus averring, Sabino at least inferentially denies that any of these monies were treated by him as being his own personal property. In support of these allegations, Sabino testified upon trial as follows:

"Q. Are you claiming this 180 acres as your own personal property?

A. Well, no, not that, guess not, but I figure to sell and give the heirs what I can get.

Q. Then you are merely taking care of this, still as administrator of your father's estate?

A. Yes."

In this same general regard Sabino further testified as follows:

"Q. A few years ago, Mr. Archuleta, you brought a quiet title suit which was civil action 3236 in this court covering lands that had been transferred to you from Damaso Vigil, Jr. and from Mrs. Saliba, Mrs. George Saliba and Maurice Saliba, is that correct?

A. Uh huh, that's correct.

Q. The property suit was brought in order to perfect the title to these properties so that you could sell?

A. Yes, so I could pay the mortgage because, what I say a while ago, because if I don't pay the mortgages they were going to foreclose.

Q. And you could not sell the property unless you cleared up the title, is that correct?

A. That's right."

\* \* \* \* \*

"Q. Did you intend, Mr. Archuleta, when you got this quiet title suit completed to cut out any rights of Lupe, or any of the other brothers and sisters?

A. No.

Q. You were still acting, then, as administrator of the estate as far as they were concerned?

A. That's right."

■ The foregoing is deemed amply sufficient to demonstrate that even Sabino himself did not regard these monies which he received from the sales of these lands as his own personal monies, but on the contrary considered them as belonging to the estate. Inasmuch then as there has never been any repudiation by Sabino of his fiduciary relationship, Sabino on the contrary being of the firm view that he was and still is acting as the administrator of his father's estate, neither the doctrine of laches nor any statute of limitation can be successfully invoked. See *Whatley v. Wood,* 148 Colo. 349, 366 P.2d 570.

■■ Under all these circumstances, Sabino should of course not only be ordered to make an accounting to the estate of the monies thus received in the sales of these various parcels of land, but he should also be required to make an accounting of all his actions as administrator of his father's estate, as required by applicable statutes. We are fully aware that Sabino's position is that all of his various acts as administrator of his father's estate were indeed quite proper and always in the best interests of the estate. Such may well be true, but only an accounting will really tell. Whether there has, or has not, been a breach of any duty by Sabino in the manner in which he has dealt with property in the estate is of course a matter which can only be deter-

mined by the trial court after full hearing. See *Estate of Blanpied v. Robinson,* 155 Colo. 133, 393 P.2d 355.

It should be remembered that this proceeding is not an accounting, as such, but only an action to determine whether there even should be an accounting. And in our view there most certainly should be such an accounting. Hence, the judgment is reversed, and the cause remanded with directions that the trial court enter an order that Sabino make an accounting to the estate of his father.

MR. JUSTICE MOORE and MR. JUSTICE PRINGLE concur.